Alright, we are prepared to hear argument in Thomas v. Omni Hotels Mgmt and Mr. Lyons, glad to hear from you. Good morning, I'm Greg Lyons, I represent the appellant, Ellen Thomas, who was injured at the homestead on November 13, 2013. She slipped on ice near a decorative water fountain that was being operated by the innkeeper, the homestead, in sub-freezing temperatures. We come to the court on Judge Dillon's grant of summary judgment against Ms. Thomas. We believe that was improvidently granted. There are issues of fact that should be presented to a jury. Omni, the innkeeper, breached its heightened duty as an innkeeper to its guest, Mrs. Thomas. A heightened duty that is recognized in Virginia law, recognized in the decisions of this court, particularly in JARMAC. It breached this duty, among other things, by exposing Mrs. Thomas to the perceivable risk of injury from operating the water fountain in sub-freezing temperatures. The duty that Omni, the innkeeper, had was described by this court in JARMAC, quoting Virginia cases, that the innkeeper had the duty to use the utmost care and diligence of very cautious persons. The innkeeper will be held liable for the slightest negligence which human care, skill, and foresight could have foreseen and guarded against. That is not how the innkeeper acted. In your view, could the homestead have just shut off the fountain on days when there were sub-freezing temperatures? That would certainly have been one thing they could have done. There are other things they could have done that morning. What else could they have done to prevent this? They could simply have not unlocked the gate that morning. The fountain sits in a walkway and there is a picture of that walkway at Joint Appendix 395, but it bisects a walkway coming out of the spa building at the homestead at the other end. What was the purpose that the fountain served? I'm sorry, Judge. Was it decorative or did they have some goldfish swimming in it? What was the purpose? Was it purely a decorative purpose? It is, to my understanding, Judge, a purely decorative fountain. Just water that was pumped up through the fountain, came out the top, dropped down into a bowl, and then cascaded down into the basin. If you observed this fountain for a bit of time, would you see the water flowing over the lower lip onto the sidewalk? I don't want to say what I think, Judge. Is it a sort of just a flow over the lower lip or is it a spray? It is a bubbling-type fountain that comes out of the top, comes down into the bowl, and as more water comes into the bowl, water is pushed out. Does the water get on the sidewalk through an overflow of the lower lip or is it a spray? As happens, and I think it's in the common experience of certainly jurors, as happens with fountains where water does flow down like this, wind can, and it doesn't take much wind, can blow that water into the area right around the fountain. We have the indication that that happened here. I thought the evidence was that they had never observed water around the fountain, and it was a slow-flowing fountain, and it had been there some six months, and they had never observed water around the fountain, and their speculation was that the water that she, or what she slipped on, we don't know. She couldn't even say what she slipped on. They came back, and there was water. It was ice there, but Homestead seems to speculate that when she fell, her hand fell inside the fountain, and when she got out, the water splashed down on the surface, which then froze, so that the employee observed it later and saw the ice. But up to that point, I think they were pretty categorical. They had never observed the water on the walk. Isn't that what the record shows? The record shows that the two gentlemen who were posed in the case on behalf of Omni said that there had never been complaints about the surface being wet. I don't know that either one of them said that they had been down there themselves to observe the fountain. No, but there's total absence of evidence of having water. They're being advised that water was somehow splashing over this fountain. This is not a heavy water fountain. This is a buffer, and it comes over and then drops from that upper basin into a lower basin, which is larger and catches the water. They said they had never seen water get out on the sidewalk, and the question now is what puts them on notice that they should expect water to get on the sidewalk. Their expectation, even from logic, is that the water got out there because when she fell, her hand was in the fountain, she came out, she was wet, and the water dripped on the ground. She went to the hospital. The employees came and looked and saw ice at that spot, which would be the water that had frozen at that point. But the more important thing is for the homestead to have some kind of notice that this was a dangerous condition that they should have addressed earlier. Let me come first to the point about the water. You at first described Omni's position about what happened with her hand. That's speculation. That's speculation. Right. The reason they speculate that way, I suppose, and they'll speak for themselves, is they had never seen water out there. There is some logic to the fact that her hand, she braced her fall and her hand was inside the fountain. When she pulls it out, there's going to be water. That was their speculation, but we don't need to get to that point. Okay. Beyond that, it is, I believe, within the common everyday experience of people who walk by fountains like this one, that are not jets, that are not, you know, propelling the water, that it happens that some of the water- So you're saying that it's just common knowledge- It's common knowledge. Water can escape from around, from the basin. Not all the water makes it down into the basin. Some of it. It won't go terribly far. My question, my question. Where does it come from? Maybe Wikipedia will- Well, there are, you know, I can't testify. What I can tell the court is there are a number of fountains in downtown Roanoke that I walk by regularly. No, but we got to have, we're talking about a particular fountain, a particular design. I understand. And there's pictures in the record, and everybody agrees it's a bubbler, where it means the water just barely comes over the top. So it's not sprayed up in the air. And then what it does, it drips into the basin, and then it drops from that basin into the lower basin. Right. And the lower basin is about five feet, the upper basin is about three feet, and so it catches the water. And as it drops- Well, as it drops. As it drops. So in that three-foot space where it drops- It's subject to the effects of, for example, wind. But it's covered by three sides, and the plaintiff and her husband said they didn't feel any wind that morning. Well, I think they both said they couldn't remember whether it was windy. Right. Well, okay. There's nothing in the record to support the view other than a calculation at the airport, which is apparently on top of a mountain. I mean, what is the explanation? I mean, to have foreseeability, sir, it seems to me you have to have, you've got to have had some knowledge that this was something that occurred. And all the evidence in the record is that it never happened before. They couldn't explain it. So even if you're right, how is it foreseeable? It is foreseeable simply by the operation of the fountain, the operation of the elements. For example, when the innkeeper's employees, Mr. Pritt and Mr. Broach, went down minutes after Ms. Thomas had been injured and took the photographs that are found of the fountain with the icicles hanging down from it that's found in JA-27, and the photograph at JA-28 of the ice-glazed leaf, that leaf came from somewhere. The water on the leaf, your argument, it came from the fountain. Right, but my point about the leaf is the leaf got into there by somewhere, likely the operation of wind, because there are no trees in that walkway. That's speculative. You know, the thing about the hand going in the water, there's things about wind. How can a reasonable jury even determine the cause? How is there in the record sufficient evidence that a reasonable jury could find foreseeability? One, the fact that there was ice. Understand that the area was described by Omni employees. At 10. At 10. As I see, there was the ice-glazed leaf, which according to the evidence record, is in essentially the area Ms. Thomas described as where she fell. The fountain had been in operation for only several months. This was its first cold weather, probably. Yeah, water would, in other words, you would have a case. If they had repeated knowledge or even knowledge during the summer that this area was wet during windy days, it got wet, and you can slip on water too, you know. Well, that's true. If they had that kind of knowledge, it seems to me it gets to be a much closer question, but the evidence is starkly absent that there was any knowledge or even suggestion that this fountain was causing a wet walkway. And absent somebody falling on a wet walkway when the weather was cold, probably nobody is going to comment about it. How long did you say the fountain had been in operation? The fountain was installed in May of 2013. So this was the first? This was the first cold weather period in which the fountain had been operating. Six months, roughly. Correct. So as you say, complaints are not likely to come up? There are not going to be complaints of ice in warm weather. Because ice is not going to form from May through October. Is there any alternative explanation that the Homestead offers for the fall, the slip-and-fall? I'm not aware of any alternative explanation that the Homestead has offered that does not involve speculation and some source of the ice other than, aside from Mrs. Thomas perhaps having splashed it out. Or after she got out, her hands and arms were wet and it dripped onto the floor. And that assumes that she got out and went into the spot where? Right next to it. Right. I'm not aware of any evidence-based explanation. I think there was a speculation that somebody might have come along. Even if we assume it was ice that day, which seems to be certainly in a light most favorable to the plaintiff, we might reach that. But if they had no warning, no prior experience that water ever got out of there, what's the basis for foreseeability? Again, I would say to the court that when you've got an operating fountain and you've got water that comes down, that water is subject to the elements. Some of it is going to get blown out. And in 22-degree weather, sub-freezing temperatures, it is reasonably foreseeable that water that escapes from the basin in that fashion is going to freeze when it hits the ground. And that morning. How do we know it escapes from the basin? It is reasonably foreseeable that it could happen. Was it raining or anything else? It was not. It was clear. So you're saying it was foreseeable simply because the water was in close proximity, the fountain was in close proximity to the wall. Correct. It's not a particularly large fountain. The water hasn't got to move very much or be moved very much to fall outside the basin of the fountain. And it is certainly reasonable inference that... I'm surprised that there wasn't any observation that afternoon or the next day or whatever about the movement of the water from the fountain as a matter of normal operation. There does not appear to be any record of that from the defendant. But why wouldn't you want to have some observation about the movement of the water? I mean, all you have to do is sit there with your expert or with your lawyer and take photographs and watch the movement of the water.  I see what you mean. That's your theory of the case. So why wouldn't you want to observe the movement of the water? There might be some evidentiary issues with that, but the after-observance of that... The movement of the water wouldn't change. Right. And whether or not it would be observed later, it doesn't change the fact that it was still reasonably foreseeable to Omni, particularly as an innkeeper charged with exercising the utmost care for its guests, that the water could escape. Couldn't you pick another sub-freezing day and take pictures of the water moving and freezing in the vicinity? Judge, I suppose we could have. Certainly, I'm sure there would have been evidentiary challenges to that. Well, that's fine, but did you try? No, Judge, we did not do that. Okay. I'm out of time. If there are any other questions, I'll... All right. Thank you. Good morning. My name is Greg Holland, Mayotte Police Court, and I represent Omni Hotels Management Corporation in this case. And the court has raised all of the issues that I just about planned to raise in my argument. When I wrote the brief on this case for Omni, basically all I did was just adopt what the trial court stated in its nine-page opinion. Judge Dillon gave a very concise statement of the facts, an accurate statement of the facts, and... Let's not just vouch for the district judge. Let me ask you this. How could the water avoid being on the walk around the fountain? Why wouldn't it be inescapable that the water would come down and be on the walkway? Judge, that had never happened before according to the Omni employees that testified in this case. And... Well, I thought there were some photographs that showed icicles on the fountain. That were on the opposite side of where Ms. Thomas fell. But icicles drip. Wouldn't some of the water get on... Yes, sir. From that photograph, those icicles would have dripped down into the basin of that fountain. This, again, is a bubbling fountain. It's not a spraying fountain. And the water just cascades over the side and falls down into this wide basin at the base of the fountain. And, again, there had never been any evidence of any water outside of that fountain. And, as Judge Dillon stated, and, well, again, I won't repeat that anymore. But the plaintiff has the burden of proof in this case. And the plaintiff has the burden to make out a prima facie case that... Judge, what happened is when the plaintiff and her husband went to breakfast earlier that morning... Don't back up on me. What about the photograph that showed a leaf underneath ice on the sidewalk, on the walkway? Yes, sir. There was what appeared to be a glazed-over leaf there. But there are trees in the area around where this fountain is. And, in fact, some of the photographs show that there are leaves on the ground there in the area where people would walk. But leaves fall without falling onto ice or without ice covering them. Well, leaves can fall and then water can somehow get on top of the leaf. And there can be a glazing over of that leaf. Isn't that troubling from your perspective? No, sir. How else would the water have gotten on the leaf? As has been stated, there... Was there any other water around? There wasn't any rain around. The only water around was from the fountain. So how could the water and ice have gotten on the leaf if it weren't for the fountain? Another person staying at the homestead could have walked by the fountain and spilled something there? That's pretty improbable. That's very improbable. I thought your theory was the most logical, that when she came out of the fountain, she's wet. And the wet dropped on the leaf and on that particular spot. And it's a localized spot where she claims she fell and got out. That's true. And they saw nothing when they were there. No ice was there when they were there. And the photograph was taken at 10, and it was 22 degrees, and that water froze. I mean, that was your explanation. That is one of the explanations. Actually, one of the explanations of Judge Dillon was that somebody could have walked by and spilled something. Again, the plaintiff has the burden in this case of proving. No, I mean, how likely is it, this explanation that you're offering, which is that another guest spills something on top of the leaf, how likely is that when the most evident water in the vicinity is from the fountain? Right. But there is no evidence that any water had come out of that fountain previously, had blown out of the fountain. What evidence is there that any other guest was walking around spilling something? There isn't any evidence of that. But still, let me ask you this. Let's assume for a minute the ice came from the fountain. Let's just assume that for a moment for purposes of this. Is it sufficient that just because a fountain is being operated and there's water, that it was foreseeable the water would get out of the fountain? Is that just the normal operation of a fountain? Is that foreseeable? No, sir. I maintain that that is not foreseeable in this case. It had never happened before. The plaintiff has the burden of proving that Omni was on notice of an actual or constructive hazard out there that morning. Normally, fountains aren't operated in freezing temperatures, mainly because they freeze the pipes. So is it just the inherent danger of operating a fountain in freezing temperatures? Is that foreseeable, that there are certain risks associated with that? Not with this fountain. I would not concede that, Judge Gergel. Why aren't these sort of common-sense observations something for the jury? Rather than us sort of bandying these kinds of things around, I wouldn't really allow a jury to take a look at these and decide what it thinks is the logical explanation. I mean, what concerns me here is you have a very elderly, you have an innkeeper's duty, and you have a very elderly patronage base. There are a number of very elderly patrons near the home who patronize the homestead. And you fall and you break a hip. Sometimes that's the beginning of the end. And why wouldn't this be some sort of duty of caution here, not to have a fountain running in the morning on a sub-freezing day and run the risk that water might get on the sidewalk? Maybe it didn't. Maybe these other explanations that you offer have some validity to it. But why wouldn't we let a jury take a look at it? Because for a jury to decide that that glazed-over leaf came from water from that fountain that might have been blown out of it or for whatever reason, that would require just rank speculation and conjecture on the part of the jury. You say speculation, but sometimes there's a question about what's speculation and what's drawing an inference from the evidence that's there. Again, we are talking about a very small spot there where that glazed-over leaf was. When the plaintiff and her husband went out there that morning on their way downtown to eat breakfast in Hot Springs, they both walked by that fountain and neither one of them had any problems with their footing that morning. Neither one of them saw any ice out there. And then when they came back 45 minutes later and she walked by and said that she slipped, she just assumed that she slipped on ice. But again, she never saw any ice before or after she fell. Her husband never saw any ice before or after she fell. Neither one of them had any problem with their footing. They saw that glazed-over leaf. Yes, sir.  The area is described as icy, but staff? Just that small area where that photograph was taken. Well, it doesn't take a big area to slip. No, sir. And ice is a patchy. You can have a walkway where for one reason or another some portion of the walkway is perfectly clear and another portion of it is quite hazardous. When the plaintiff fell and her arm went into the fountain, her husband immediately, who was walking on the other side of the fountain, immediately came around and helped her up in the same area where she fell. He had no problem with his footing in that area. And again, neither one of them saw any ice. But the employees saw ice when they photographed the area or they testified, I guess, that they would never dispose. Well, 30 minutes. They saw ice on the walkway after the fall. The leaf, the glazed-over leaf. Yes, sir. It looks to me like there might have been a small patch, including some on the sidewalk. I mean, the leaf just shows up. But I don't quite know why it isn't almost a total inference that when she gets out of hand, out of water, water drips from her hand and her arm onto the sidewalk. Right. And the employee came by a half hour later and saw that little patch of ice. Right. And told her, we saw the ice. And she then later said, that's what I slipped on. Well, she never saw it in the morning and neither one of them saw it. But they did make the place wet, inevitably. They didn't have a towel to dry off their hand as she pulled it out. Right, right. She is the one that made that area wet. But it wasn't the fountain that made that area wet. And again, Excuse me. How did she make the area wet? I mean, you're talking about speculation as opposed to how did she make the area wet? Or some, you have these theories, or some passerby made the area wet. How did she make it wet? What happened when she fell, her right arm went into the fountain. There was water in the fountain. When she fell, her arm went into the fountain. Her husband came over, helped her up, and he said the testimony in the record is that her arm was wet up to her shoulder, from her wrist up to her shoulder from the water that was in the fountain. And that is another issue as to how the ice would have gotten on the area surrounding the fountain when there's water in the base of the fountain. Now, Ms. Thomas claims throughout her brief that it was windy out there that morning and that's how the water somehow, you know, somehow, was blown out of the fountain onto the sidewalk. But the evidence... Was there a bar to photographing the operation of the fountain? No, Judge. You wouldn't have objected to... No, sir. No, sir. And again, we found... Do you think they should have photographed the fountain in operation? Yes, sir. Perhaps that may have helped. But we filed our motion for summary judgment after discovery had closed. Everybody's deposition had been taken and written discovery had been exchanged between the parties and also the time for designating experts had come and gone. And... I'm just trying to understand why there wasn't timely photographs of the fountain in operation. Because you had something that's easily observable and highly relevant. I mean, why? Why wasn't it photographed? Judge, it is... It's not your burden. It's not our burden. And there is already testimony that during the time that fountain had been in operation, nobody had ever observed any water out of that fountain. And again, we're not talking about ice all around the fountain here. We're talking about a small area of ice that was photographed by the Omni employees. And throughout the brief of the appellant and the reply brief, they continue to maintain that it was windy out there that day, and that's how the water got out of that fountain. The evidence in this case is on wind is the day before this fall occurred, when the plaintiff and her husband got there. He went out for a walk. They said the temperature was around 40 or 50 degrees, and there was a bit of wind that day. The next... This is given for where the water on her arm... Her arm was wet. Yes, sir. What's the explanation for where that water went after she came out of the fountain? I suppose it just... The explanation, I suppose, would be that it dripped on the area there where her husband was helping her up and then froze. I don't see any other explanation for it. And there is no evidence of when the water got there, how it got there, and this ice, and how long it was there before the plaintiff fell. And again, it's her burden to establish there was actual or constructive notice on the part of Omni of a defect. What the plaintiff is saying here is that the presence of a fountain, which is... Water is moving freely and exists in close proximity to a walkway. And there are going to be people using the walkway, including a large number of elderly people. And it's early in the morning, and there are sub-freezing temperatures that, given an innkeeper's duty, one might anticipate that there would be a significant risk. And how much of a burden would it be on you to discontinue the use of the fountain until temperatures warmed up a little bit? Well, it was 40 or 50 degrees the day before. Apparently, the temperature dropped that night. Right, so it does. We're talking about a high elevation at nighttime. But you could have turned it off during hours when temperatures were well below freezing. Well, again, I certainly understand your point on that, Judge Wilkins. But, again, there is... You look at the fountain and the way the water just bubbles over there. There is, without wind or something, to make that water get on that walkway. There... It just... It doesn't happen. And, again, that is the plaintiff's burden. Thank you. Counsel, you have some reserve, some time for rebuttal. I have, Your Honor. The thing that the case bottoms out on is how likely is it or how possible is it that water would either flow or spray or by some... somehow go from the fountain to the surrounding walkway? And you know on that point you need to rescue your case from utter speculation. And the best way to do that is to observe and to photograph the fountain in operation and just to... It's not a hard... You don't need to hire an expert witness for it. It's not... This is not a typical products liability case. It is a question of did... Was it possible at all? Was it possible or plausible that water would come from the fountain onto the ice? You have the burden of proof on that. And the best way, it seems to me, to satisfy the burden of proof is to observe, photograph or observe what actually happens with the water in the fountain. Why wasn't that done? Um... Judge... Ette and Mr. Holland might be able to help me. I don't remember the timing of it. The... I believe the fountain itself at least while the case was in... This case was in litigation was replaced. It's not the same fountain. I think it happened after the case had been filed. What happened? The fountain was replaced? Yes. Well, that's quite a bit later though. That's when a child ran into it and shut it over and it broke. Correct. And they replaced it with another fountain. Right. Well, but there was a period of time before it was replaced. Um... There was, Judge, we... Why didn't you answer my question? Why wasn't there some evidence about the normal flow of water in the fountain? That's what you have for a critical piece of your case. Um... Were you afraid of doing that because you were afraid of what the observations and the photographs would show? Absolutely not, Judge. Then why didn't you do it? I can't give the court a good explanation for it. How about hiring experts to say that always there's off spray from a fountain like this even without the observation? Hire a fellow who runs a garden shop who puts those in to say that always happens. The record seems to be missing a very critical piece here, sir. That's the problem. We might have hired an expert for that, Judge. We might also have been met with an objection that we're asking an expert to opine to something that a jury, a juror, can as easily draw a conclusion about from their ordinary, everyday experiences. As for the foreseeability, the fact that there hadn't been prior complaints about water escaping from the basin, not foreseeable. There had been, you know... We have offered one explanation of how water got outside the basin. Another explanation has been discussed today regarding water potentially dripping from Mrs. Thomas' hand or wrist or arm. That seems to... Correct, but we don't know exactly where she came up and was standing afterwards. We have a dispute of fact. He came around and helped her up. Right, but did he help her up in exactly the same spot where she fell? Did she move back a little bit? Those are matters for evidence that are not, as far as I'm aware, in the record, so we have a dispute of fact. This is, as you commented, Judge Wilkinson, this is a matter to let the jurors hear, let them decide it. Let's not decide it on summary judgment. You've got a lot of things going for you in terms of the leaf under the ice and in terms of the innkeeper's duty and in terms of the proximity of water to the walkway and in terms of the sub-freezing temperature. I don't know why you didn't put that final... I don't know why you didn't put that final piece in. And at trial, Judge, not having that final piece might lead a jury to rule against us. On summary judgment, it should not be a deciding factor when there is a dispute. You know that's not the whole story on that. It's got to be something... It's got to be an issue of triable fact. The question is whether it's an issue of triable fact about this particular piece of evidence for him. All right, thank you. Thank you, Judge. We'll take a brief recess right after we shake hands with counsel.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Richard Mark Gergel